## CIRCUIT COURT OF FAIRFAX COUNTY

Fairfax County
Economic Development Authority

v.

Dykes et al.

### April 27, 1993

### Case No. (Law) 121909

By Judge Thomas J. Middleton

This case is before the Court on the defendants' motions argued on April 12, 1993. After hearing oral argument, the Court took under advisement the defendants' motion to dismiss (demurrer) for failure to conduct a public hearing on the proposed bond issue. For the reasons set forth below, the Court denies the motion to dismiss and directs the parties to proceed with discovery.

The defendants argue that the petition filed by the Economic Development Authority (EDA) for the validation of the lease revenue bonds should be dismissed because the EDA has not held a public hearing on the bond issue. The defendants claim that two provisions of law governing the issuance of these bonds require a public hearing. They contend that both Article VII, paragraph 7, of the EDA By-laws and Virginia Code § 15.1–227.8 require this hearing. The Court will address each of these arguments in turn.

I. *The Public Hearing Requirement under the By-laws of the Economic Development Authority*

A. *Application of Article VII, Paragraph 7, to the Lease Revenue Bonds*

The defendants first argue that the EDA's By-laws require a public hearing before the EDA votes on the bond issue and makes its recommendation to the County Board of Supervisors. Article VII, paragraph 7, of the By-laws provides:

No application for the issuance by the Authority of an *industrial development bond* shall be acted upon by the Authority without there first being a public hearing by the Authority in conformity with Section 103(k) of the Internal Revenue Code of 1954, as amended, and in conformity with Section 15.1–1378.1 of the Code of Virginia, as amended. Following such a public hearing, and if a majority of all of the Commissioners of the Authority so vote, the Authority shall make a recommendation to the Board of Supervisors of Fairfax County, Virginia, that the issuance of such bond or bonds be approved by the Board of Supervisors. [Emphasis added.]

The first question before the Court in determining the applicability of this Bylaw is whether the lease revenue bonds proposed by the EDA are in fact industrial development bonds.

Industrial development bonds are ordinarily issued by industrial development authorities under Chapter 33 of Title 15.1. The lease revenue bonds now under consideration are issued pursuant to Section 11 of the Enabling Legislation of the EDA, which provides in pertinent part:

The Authority shall have the power to issue bonds from time to time in its discretion, for any of its purposes, including the payment of all or any part of the cost of Authority facilities and including payment or retirement of bonds previously issued by it . . . .

The Authority shall, in addition, have all the powers to issue bonds as are conferred upon industrial development authorities created pursuant to Chapter 33 of Title 15.1 of the Code of Virginia, as amended or hereafter amended, except that the Fairfax County Economic Development Authority shall issue bonds for the construction, financing or refinancing of a facility or enterprise which is to be used principally for retail sales only when the facility or enterprise is located in a conservation area, redevelopment district or rehabilitation district designated by the governing body of the county.

This section of the Enabling Legislation grants the EDA the authority to issue bonds to further any of the EDA's purposes.[1] The definition of "bonds" is provided in Section 23(d) of the Enabling Legislation: "'Bonds' or 'revenue bonds' shall embrace notes, bonds and other obligations authorized to be issued by the Authority pursuant to the provisions of this act." With this general definition of "bonds," the EDA's authority to issue bonds is not limited to the issuance of industrial development bonds under Code § 15.1–1373 et seq. The Enabling Legislation in fact first recognizes the EDA's ability to issue bonds of a general nature, and then it grants the EDA the authorization to issue a specific type of bond as defined by the Virginia Code.

The Court finds that the bonds proposed by the EDA in this validation proceeding are not industrial revenue bonds and that Article VII, paragraph 7, of the By-laws requiring a public hearing in compliance with federal tax law and with Code § 15.1–1378.1 does not apply to this bond issue. The Court will address, however, the suggestion that the EDA bonds must comply with federal tax law because the interest generated by the bonds is to be exempt from federal taxation.

### B. *Sections 103(k) and 147(f) of the Internal Revenue Code*

Although the Court has determined that Section VII, paragraph 7, of the By-laws does not apply to the EDA bonds under consideration by the Court, this section of the By-laws refers to compliance with § 103(k) of the Internal Revenue Code as necessary for the issuance of bonds bearing interest exempt from federal tax. Section 103(k) requires a public hearing when *industrial development bonds* bearing federally tax-exempt interest are to be issued; again, industrial development bonds are not the type of bonds under consideration in this litigation.

The plaintiffs have suggested that § 103(k) has evolved into § 147(f). Section 147(f) requires a public hearing or voter referendum

---

[1] The purposes of the EDA are given in Section 24 of the Enabling Legislation: "It is the intent of the legislature by the passage of this act to create development authorities in this Commonwealth to acquire, own, lease and dispose of properties to the end that such authorities may be able to promote industry, governmental and commercial enterprises to locate in or remain in this Commonwealth and further the use of its agricultural products and natural resources . . . ." The bonds proposed for validation support one of the EDA's allowed purposes in that the bonds promote a governmental enterprise to locate in and remain in Virginia.

if private activity bonds are to be issued. Private activity bonds are defined in § 141(a), which provides in pertinent part:

(a) *Private Activity Bond.* — For purposes of this title, the term "private activity bond" means any bond issued as part of an issue:

(1) which meets:

(A) the private business use test of paragraph (1) of subsection (b), and

(B) the private security or payment test of paragraph (2) of subsection (b), or

(2) which meets the private loan financing test of subsection (c).

The questions before the Court in deciding whether the EDA bonds are private activity bonds are first, whether the bonds meet the private business use test of § 141(b)(1) *and* the private security or payment test of § 141(b)(2), and second, whether the bonds meet the private loan financing test of § 141(c).

The private business use test given in § 141(b)(1) is met if more than 10 percent of the proceeds of a bond issue are used for any private business use. Private business use is defined in § 141(b)(6) as "use (directly or indirectly) in a trade or business carried on by any person other than a governmental unit."

The defendants urge an interpretation of "private business use" that would designate all purchases from non-governmental entities financed by bond issues as purchases for private business use. The petition for validation of the EDA bonds states, however, that the bond proceeds are to be used to finance the purchase of real property owned and/or used solely by Fairfax County and the EDA. While the property is to be purchased from a private owner, the property is to be acquired for the sole benefit of governmental entities. Therefore, the private business use test is not satisfied. The Court need not reach the private security or payment test given in § 141(b)(2) because the private business use test is not met; however, for the reasons previously stated as to the private business use test, the Court finds the private security or payment test equally inapplicable.

The Court must also consider whether the bonds are private activity bonds requiring a public hearing under the private loan financing test of § 141(c). If the lesser amount of $5 million or 5% of the bond

proceeds is to be used to finance loans to persons other than governmental units, the private loan financing test is met, and the bonds are private activity bonds. The EDA bonds presently under consideration do not call for loan financing to be made to any private entity. The Court finds therefore that the EDA bonds are not private activity bonds under the private loan financing test.

Federal law does not require the EDA to hold a public hearing before it issues these bond because none of the three tests has been met to designate the EDA bonds as private activity bonds.

II. *The Public Hearing Requirement Under Virginia Code § 15.1–227.8*

In addition to their argument that both the EDA By-laws and the Internal Revenue Code require a public hearing before the EDA may issue these bonds, the defendants also claim that Code § 15.1–227.8 requires the public hearing. This statute is part of the provisions applicable to all bonds given Public Finance Act, Title 15.1–227.1 et seq.[2] The text of § 15.1–227.8 reads as follows:

> § 15.1–227.8 *Public hearing before issuance of bonds.* — A. Notwithstanding any contrary provision of law, general or special, but subject to subsection B of this section, before the final authorization of the issuance of any bonds *by a unit*, the governing body of the unit shall hold a public hearing on the proposed bond issue . . . . [Emphasis added.]

The question before the Court in applying this statute is whether the EDA is to be considered a "unit" such that a public hearing is required before final authorization of the bonds. To answer this question, the Court will consider both the definition of "unit" as it is given under this chapter of the Code and the Virginia case law on the matter.

A. *The Definition of "Unit" Under the Public Finance Act*

Section 15.1–227.8 of the Code defines "unit" for the purposes of the Public Finance Act as "any county or municipality." "Municipality" is defined in that same section of the Code as "any city or town in the Commonwealth, whether incorporated by a special act or under a

---

[2] The plaintiffs argue that this validation proceeding was instituted solely under Article 6 of the Public Finance Act and that the other Articles of this Act, including § 15.1–227.8 given in Article 2, do not apply to the EDA bonds under consideration by the Court. The Court recognizes that § 15.1–227.52 stated in Article 6 provides that Article 6 supersedes all other acts and statutes on the subject.

general law." The EDA is clearly neither a county nor a municipality under these definitions. The defendants urge the Court to look beyond these definitions, however, at the powers given to the EDA and restrictions placed upon it in determining whether the EDA is truly independent of Fairfax County.

## B. *The EDA as a Separate and Distinct Legal Entity under Suthers*

### 1. *General Characteristics of the EDA*

Section 1 of the Enabling Legislation creates the Fairfax EDA as a political subdivision of the Commonwealth, and Section 12.1(e) declares the EDA to be a public instrumentality of Fairfax County. The dual nature of the EDA leads the Court to examine the reasoning of the Virginia Supreme Court in *Industrial Development Authority of the City of Chesapeake v. Suthers*, 208 Va. 51, 155 S.E.2d 326 (1967), in finding that the Chesapeake Industrial Development Authority (IDA) was not an alter ego the City of Chesapeake. First, the Supreme Court recognized in *Suthers* that the IDA was not a "device or pretense" created to evade the restrictions placed upon the City and that the IDA was created by the General Assembly to perform a purpose designated by the General Assembly. 208 Va. at 57. The EDA as well is not a "device or pretense" created to evade the limitations placed on Fairfax County, and the EDA was created by the legislature with its own designated purpose.

The Supreme Court went on to find in *Suthers* that the IDA was independent of the City of Chesapeake in its operations, its incurment of debt, and its ownership of property. *Id.* First, as to the operations of the EDA, the defendants argue that the EDA is not independent of Fairfax County because under Section 3 of the Enabling Legislation, the Board of Supervisors appoints the seven EDA commissioners; under Section 5, Fairfax County may compensate each commission member an amount up to $1,200 per year for the commissioner's services; and under Section 10, Fairfax County may make appropriations and provide funds for the operation of the EDA.

The Virginia Supreme Court recognized the independence of the Chesapeake IDA in *Suthers* although Code § 15.1–1377 provides that the IDA commissioners are to be appointed by the governing body of the municipality and are to be compensated by the municipality an amount not to exceed $50 per meeting. The identical characteristics of the EDA do not prevent it, therefore, from operating independently of

Fairfax County. As to the County's authorization to provide appropriations to the EDA, the Court has no evidence before it that would indicate that mere funding of the EDA by the County would undermine the EDA's independence or would demonstrate control of the EDA by the County.

As to the EDA's incurment of debt, Section 18 of the Enabling Legislation provides that the EDA has the power to borrow money and accept contributions, grants, and other financial assistance from the United States of America, the Commonwealth, and their political subdivisions, agencies, and public instrumentalities for use in construction, acquisition, ownership, maintenance, or repair of the EDA facilities or for the payment of bond principal. The EDA is not required to obtain the consent of the County to incur this debt.

Finally, as to the EDA's ownership of property, Section 6(b) of the Enabling Legislation authorizes the EDA to acquire EDA facilities and other real and personal properties as the EDA commissioners deem necessary. Under Section 19.1, however, the EDA must obtain the consent of another political subdivision if it occupies or uses any land, streets, buildings, structures, or other property owned by that political subdivision.

## 2. *The EDA's Authority to Issue Bonds*

In evaluating the EDA's legal independence from Fairfax County, the Court finds particularly significant the authority to issue bonds given to the EDA in Section 13.1 of the Enabling Legislation. This section requires only the resolution of the EDA Commission before the bonds are issued; the EDA is not required to hold a public hearing, obtain the approval of the Fairfax County Board of Supervisors, or a hold voter referendum before issuing the bonds. Section 19.1 states specifically that "no proceedings, notice, or approval shall be required for the issuance of any bonds or any instrument as security therefor, except as herein provided, any other law to the contrary notwithstanding . . . ." Section 12.1 declares as well that the bonds issued by the EDA are to remain the debt of the EDA and are not to constitute the debt or pledge of the Commonwealth or any of its subdivisions.

Based on the Virginia Supreme Court's reasoning in *Suthers*, the Court finds that the EDA is sufficiently independent of the County in its operations, ownership of property, incurment of debt, and authority to issue bonds as to preclude the EDA from consideration as part of the

"unit" under Code § 15.1–227.8. As such, a public hearing is not required.